**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

HESS ENERGY, INCORPORATED,
    *Plaintiff-Appellee,*

v.                    No. 02-2129

LIGHTNING OIL COMPANY, LIMITED,
    *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(CA-00-1347-A)

Argued: May 6, 2003

Decided: July 31, 2003

Before WILKINSON, NIEMEYER, and TRAXLER, Circuit Judges.

_____

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Wilkinson and Judge Traxler joined.

_____

**COUNSEL**

**ARGUED:** Joseph E. Altomare, Titusville, Pennsylvania, for Appel-
lant. Daniel M. Joseph, AKIN, GUMP, STRAUSS, HAUER &
FELD, L.L.P., Washington, D.C., for Appellee. **ON BRIEF:** Anthony
T. Pierce, Michael L. Converse, Kelly M. Skoloda, AKIN, GUMP,
STRAUSS, HAUER & FELD, L.L.P., Washington, D.C., for Appel-
lee.

_____

**OPINION**

NIEMEYER, Circuit Judge:

After it was determined that Lightning Oil Company, Ltd., antici-patorily repudiated its contract to sell natural gas to Hess Energy, Inc., *see Hess Energy, Inc. v. Lightning Oil Co., Ltd.*, 276 F.3d 646 (4th Cir. 2002), a jury trial was held to determine Hess' damages under the Virginia Uniform Commercial Code. After having been instructed by the district court that the measure of damages is "usually the differ-ence between the contract price and the market price, at the time and place of delivery," the jury returned a verdict in favor of Hess for $3,052,571.

On appeal, Lightning contends that the jury was improperly instructed and that damages should have been calculated using the market price as of *the date Hess learned that Lightning would not perform* rather than as of *the date of delivery*. For the reasons that fol-low, we affirm the judgment of the district court.

I

Under a Master Natural Gas Purchase Agreement (the "Master Agreement") dated November 1, 1999, Lightning agreed to sell and Statoil Energy Services, Inc. agreed to buy natural gas. The Master Agreement set forth the general terms of the parties' contractual rela-tionship, and subject to these terms, the parties entered into a series of specific natural gas purchase agreements, called "confirmations." The confirmations detailed the purchase period, purchase price, pur-chase volume, delivery point, and other relevant terms. Between November 16, 1999, and March 7, 2000, Lightning and Statoil entered into seven different confirmations under which Lightning agreed to sell fixed quantities of natural gas to Statoil on specified future dates at fixed prices.

In February 2000, Amerada Hess Corporation purchased the stock of Statoil and changed Statoil's name to Hess Energy, Inc. ("Hess"). After the change in name, Hess continued to purchase natural gas from Lightning under the confirmations, and Lightning continued to honor its obligations, at least for a period of time.

2

In June 2000, Lightning located a buyer willing to pay Lightning a better price than Hess had agreed to pay in its confirmations with Lightning, and Lightning entered into a contract with that buyer to sell the natural gas promised to Hess. Lightning then notified Hess in July 2000 that it was terminating the Master Agreement, stating that Statoil's stock ownership change and name change to Hess pursuant to the stock purchase agreement was an assignment of Statoil's contractual obligations in material breach of the anti-assignment provision of the Master Agreement.

Hess commenced this action seeking a declaratory judgment that it had not breached the Master Agreement and demanding compensatory damages for Lightning's nonperformance. We concluded, in an earlier appeal, that even if Lightning could prove that there was an assignment of contractual obligations in the case, any such assignment "could not be a material breach" of the Master Agreement and the confirmations entered into under that agreement. *Hess Energy*, 276 F.3d at 651. We remanded the case to the district court "for determination of Hess Energy's damages under the confirmation contracts." *Id.*

At the trial on damages, Hess' Director of Energy Operations testified about Hess' method of doing business. He explained to the jury that Hess' business was to purchase natural gas from entities like Lightning through agreements such as the confirmation contracts and, once it did so, to locate commercial customers to which it could sell the natural gas. Hess' business was not to profit on speculation that it could resell the purchased natural gas at higher prices based on favorable market swings, but rather to profit on mark-ups attributable to its transportation and other services provided to the end user of the natural gas. Because Hess entered into gas purchase contracts often at prices fixed well in advance of the execution date, it exposed itself to the serious risk that the market price of natural gas on the agreed-to purchase date would have fallen, leaving it in the position of having to pay a higher price for the natural gas than it could sell the gas for, even after its service-related mark-up. To hedge against this market risk, at each time it agreed to purchase natural gas from a supplier at a fixed price for delivery on a specific date, it also entered into a NYMEX futures contract to sell the same quantity of natural gas on the same date for the same fixed price. According to ordinary com-

3

modities trading practice, on the settlement date of the futures contract, Hess would not actually sell the natural gas to the other party to the futures contract but rather would simply pay any loss or receive any gain on the contract in a cash settlement. In making this arrangement, Hess made itself indifferent to fluctuations in the price of natural gas because settlement of the futures contract offset any favorable or unfavorable swings in the market price of natural gas on the date of delivery, allowing Hess to eliminate market risk and rest its profitability solely on its transportation and delivery services. Indeed, the sole purpose of advance purchase of natural gas in the first instance was to lock in access to a supply of natural gas, which it could then promise to deliver to its customers.

Focusing on the particular transactions in this case, Hess' Director of Energy Operations testified that when Lightning anticipatorily repudiated its agreements to supply natural gas to Hess at specified prices, Hess was left with "naked" futures contracts. By repudiating the Master Agreement and related confirmations, Lightning extinguished the supply contract against which the NYMEX futures contract provided a hedge, exposing Hess to the one-sided risk of having a futures sales contract that did not offset any corresponding supply contract to purchase natural gas for delivery at a future date. Thus, when the price of natural gas rose after Hess entered into both the confirmations with Lightning and the offsetting futures contracts, Hess was exposed, after Lightning's repudiation, to loss on the futures contracts (because it would have to sell gas at a below-market price) without the benefit of its bargain with Lightning, i.e., the ability to purchase the same quantity of natural gas at the below-market price. Facing losses on the open futures contracts, Hess bought itself out of some of the futures contracts with closer settlement dates, fearing that the market for natural gas would continue to go up with the effect of increasing its losses on those contracts. As a result of having to buy itself out of these futures contracts, Hess suffered out-of-pocket damages.

Hess' expert witness, Dr. Paul Carpenter, who was a specialist in the valuation of natural gas, offered two methods for computing Hess' damages: (1) the "lost opportunity method," which "simply compare[d] the cost of gas that Hess would have paid to Lightning had Lightning performed under the contract with the market value of the

4

gas at the time that that gas would have been delivered to Hess," where the difference between the values would be the measure of damages, and (2) the "out-of-pocket costs" method, which measured "the impact on Hess directly of the fact that Lightning failed to deliver under the contract." Dr. Carpenter testified that these two methods were really "driving at the same thing" and that he employed both methods to give "more comfort as to what . . . the range" of damages was. The principal difference between the two methods was that the out-of-pocket method accounted for the damages Hess suffered by buying out its futures contracts, while the lost opportunity method assumed that Hess did nothing to alter the hedges.

In calculating the contract-market differential under the lost opportunity method, Dr. Carpenter determined that the market value of the contracts, calculated using the actual price at which natural gas traded on the relevant dates of delivery on the NYMEX, was $8,106,332. He stated that the NYMEX price was the best indicator of market price because (1) "the parties themselves referred to the NYMEX exchange when they established the contract themselves, so the parties recognize the NYMEX price as a valid reference price for gas" and (2) "the NYMEX price is probably the . . . most widely referenced and used natural gas price in North America . . . [and] represents the best indicator of a commodity price for natural gas." Because the contract price of the natural gas that Hess had agreed to purchase from Lightning under the confirmations was $5,053,761, the resulting damage to Hess under the "lost opportunity" method was $3,052,571. Dr. Carpenter calculated damages under the out-of-pocket method as $3,338,594.

Lightning offered no expert testimony and it did not offer a competing method of calculating the damages. It also did not suggest any damages figure to the jury. Rather, its position at closing argument was that Hess should have gone out at the time of Lightning's repudiation and replaced the confirmation contracts by entering into similar contracts with other suppliers at sub-NYMEX prices. Lightning argued that Hess "sat idly by during a period of time when they knew the price [of natural gas] was going up, up, up, up, up, up" and that Hess "could have in August of 2000 gone out and purchased the same amount of gas that we . . . were supposed to supply them for that future period at a much lower price." Lightning also argued that the

5

NYMEX price was not the relevant market price because that price did not reflect the price at which a "producer" like Lightning would sell to a "marketer" like Hess.

After closing arguments, the district judge instructed the jury on the measure of damages as follows:

> When a seller fails or refuses to deliver the contracted-for goods, the measure of damages is usually the difference between the contract price and the market price, at the time and place of delivery, with interest, and the buyer for its own protection has the right under the circumstances to buy the goods in the open market, and charge the difference in price to the seller's account. The remedy for a breach of contract is intended to put the injured party in the same position in which it would have been had the contract been performed. In your verdict, you may provide for interest on any principal sum awarded or any part thereof and fix a period at which the interest shall commence.

The jury returned a verdict of $3,052,571, with interest beginning on June 1, 2001. This amount was equal to Dr. Carpenter's calculation under the lost opportunity method.

From the district court's judgment entered on the jury's verdict, Lightning filed this appeal.

## II

For its principal argument on appeal, Lightning contends that the district court erred in instructing the jury that the proper measure of damages under Virginia law was the difference between the contract price and the market price *at the time and place of delivery*. Lightning argues that under the Virginia Uniform Commercial Code § 8.2-713, "[t]he proper measure of damages in this case is the difference between the contract price and the market price *at the time Hess learned that Lightning would not perform*." (Emphasis added).

In arguing that the district court correctly instructed the jury under Virginia law, Hess argues that Lightning's interpretation of Virginia

6

Code § 8.2-713 "wrongly equates the term `learned of the *breach*' with the time at which the innocent party `learned of the [wrongdoer's] *repudiation*'" and "renders meaningless other sections of the [Uniform Commercial Code] including Va. Code § 8.2-723." "[E]quating a contract's breach with its mere repudiation" is "bad policy," Hess argues, because it "would require the innocent party to cover immediately . . . or risk being uncompensated for losses caused by increased prices in the period following the repudiation."

It is undisputed in this case that the Master Agreement and the confirmations entered into under it were subject to the provisions of Virginia's Uniform Commercial Code, Va. Code § 8.1-101 *et seq.* The core dispute between the parties concerns *when* the market price of the undelivered natural gas should be measured for purposes of calculating damages and to what degree Hess' damages may be limited by an asserted duty to cover. While this case presents an archetypal anticipatory repudiation, *see* 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 6-2, at 286 (4th ed. 1995) (noting that the "clearest case" giving rise to an anticipatory repudiation is "when one party — declaring the contract invalid or at an end — accuses the other of materially breaching the contract, and states that he no longer will do any business with the other party"), measuring a buyer's damages in such circumstances "presents one of the most impenetrable interpretive problems in the entire [Uniform Commercial] Code." *Id.* § 6-7, at 337.

We begin the analysis by pointing out that the overarching principle given by the district court's instruction to the jury — "the remedy for breach of contract is intended to put the injured party in the same position in which it would have been had the contract been performed" — conforms to the governing principle for damages under the Virginia Uniform Commercial Code. *See* Va. Code § 8.1-106 (stating that the Code's remedies "shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed").

Under the specific provisions for damages, the Virginia Uniform Commercial Code provides that when a seller repudiates a contract, the buyer is given several alternatives, none of which operates to penalize the buyer as a victim of the seller's repudiation. *See* Va.

7

Code § 8.2-610. One option provided by § 8.2-610 is for the buyer to "resort to any remedy for breach (§ 8.2-703 or 8.2-711), even though [the buyer] has notified the repudiating [seller] that he would await the latter's performance and has urged retraction." *Id.* § 8.2-610(b). Section 8.2-711, in turn, allows a buyer either to "`cover' and have damages under the next section [§ 8.2-712] as to all the goods affected" or to "recover damages for nondelivery as provided in this title (§ 8.2 713)." In this case, Hess chose not to cover, opting instead to recover damages for nondelivery under § 8.2-713.

Section 8.2-713 provides:

> [T]he measure of damages for nondelivery or repudiation by the seller is the difference between the market price *at the time when the buyer learned of the breach* and the contract price together with any incidental and consequential damages provided in this title (§ 8.2-715), but less expenses saved in consequence of the seller's breach.

Va. Code § 8.2-713(1) (emphasis added). Lightning would have us equate "the time when the buyer learned of the *breach*" with the time when the buyer learned of the *repudiation* and require calculating damages using the market price of the contracted-for natural gas at the time Hess learned that Lightning would not perform. Hess contends, on the other hand, that the time when it learned of the breach for purposes of § 8.2-713 did not occur "until each time [Lightning] failed to deliver natural gas as promised in its contract," rather than at the time Lightning communicated its intent not to perform.

These diverse positions reduce to the core question of whether "breach" as used in "when the buyer learned of the breach" means "repudiation," or whether "breach" refers to the date of actual performance when it could be determined that a breach occurred — in this case, the date of delivery.

While § 8.2-713 might be susceptible to multiple interpretations, *see* White & Summers, *supra*, § 6-7, at 337 (articulating at least three possibilities), we conclude that the drafters of the Uniform Commercial Code made a deliberate distinction between the terms "repudiation" and "breach," and to blur these two words by equating them

8

would render several related provisions of the Uniform Commercial Code meaningless. This is best illustrated by reference to § 8.2-610. In that provision, an aggrieved buyer can wait "a commercially reasonable time" after learning of the seller's repudiation to allow the seller to change its mind and perform. Va. Code § 8.2-610(a). If Lightning's interpretation of § 8.2-713 were the correct one — that the damages should be calculated based on the market price on the date of repudiation — then the buyer would be deprived of his right under § 8.2-610 to await a reasonable time for seller's possible post-repudiation performance. *See* White & Summers, *supra*, § 6-7, at 339 ("[I]f the buyer's damages are to be measured at the time the buyer learned of the repudiation, then it cannot do what 2-610(a) seems to give it the right to do, namely await performance for a `commercially reasonable time' — at least not without risking loss as a result of postrepudiation market shifts").

In another example, if the date of the seller's repudiation is equated with the time when the buyer learns of the seller's breach as used in § 8.2-713, then § 8.2-723(1) would become meaningless. Section 8.2-723(1) provides:

> If an action based on anticipatory repudiation comes to trial before the time for performance with respect to some or all of the goods, any damages based on market price (§ 8.2-708 or § 8.2-713) shall be determined according to the price of such goods prevailing at the time when the aggrieved party learned of the repudiation.

This section moves the date that the seller learned of the *breach* under § 8.2-713 to the date that the seller learned of the *repudiation* in circumstances where the case has come to trial before the performance date. To give meaning to § 8.2-723(1), when the case does *not* come to trial before the performance date, as here, damages are *not* measured when the aggrieved party learned of the repudiation. *See* White & Summers, *supra*, § 6-7, at 341 (commenting that a reading that equates the date of breach with the date of repudiation "makes the portion of 2-723(1) which refers to 2-713 superfluous" and concluding that the drafters "must have thought `learned of the repudiation' had a different meaning than `learned of the breach'").

9

Thus, we conclude that the better reading of § 8.2-713 is that an aggrieved buyer's damages against a repudiating seller are based on the market price on the date of performance — i.e., the date of delivery. This reading also harmonizes the remedies available to aggrieved buyers and aggrieved sellers when faced with a repudiating counterpart. Faced with a repudiating buyer, an aggrieved seller is entitled to "recover damages for nonacceptance" under § 8.2-708. Va. Code § 8.2-703; *id.* § 8.2-610 (directing aggrieved seller to § 8.2-703). Under § 8.2-708, "the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price *at the time and place for tender* and the unpaid contract price together with any incidental damages." *Id.* § 8.2-708 (emphasis added). There is nothing in the Uniform Commercial Code to suggest that the remedies available to aggrieved buyers and sellers in the anticipatory repudiation context were meant to be asymmetrical. Indeed, the lead-in clause to § 8.2-610, relating to anticipatory repudiation, addresses both parties: "When either party repudiates the contract with respect to a performance not yet due . . . ."

Because our interpretation of § 8.2-713 avoids rendering other sections of the Uniform Commercial Code meaningless or superfluous and harmonizes the remedies available to buyers and sellers, we are persuaded that in this case "the time when the buyer learned of the breach" was the scheduled date of performance on the contract, i.e., the agreed-upon date for the delivery of the natural gas, not the date that the seller informed the buyer that it was repudiating the contract.

This reading is also consistent with Virginia's pre-UCC general common law rule that "the measure of damages is the difference between the contract price and the market price at the time and place of delivery." *See Nottingham Coal & Ice Co. v. Preas*, 47 S.E. 823, 824 (Va. 1904). The Virginia Comment to § 8.2-713 provides that "[t]he prior Virginia cases are in accord with subsection 8.2-713(1)." Va. Code § 8.2-713 Va. cmt. (citing Virginia cases). Although none of the Virginia cases cited in the Virginia Comment addressed specifically the measure of a buyer's damages on a claim against a repudiating seller, White and Summers note that "[p]re-Code common law, the Restatement (First) of Contracts, and the Uniform Sales Act all permitted the buyer in an anticipatory repudiation case to recover the contract-market differential at the date for performance." White &

10

Summers, *supra*, § 6-7, at 341. We agree that if the drafters of the Uniform Commercial Code had meant to "upset such uniform and firmly entrenched doctrine," the Code would contain explicit statutory language making such a departure clear. *Id.*

In reaching this conclusion, we point out that Lightning's view would unacceptably shift the risks undertaken by the parties in their contract. Under Lightning's view, an aggrieved buyer facing a repudiating seller has two choices: (1) to cover within a commercially reasonable time and receive damages based on the cover price or (2) to forgo the opportunity to cover and simply await the date of performance. Lightning contends that if the buyer opts for the second option and the market price then falls, the buyer's savings must be shared with the seller. "[B]ut if it rises, the aggrieved party cannot recover the higher amount that resulted from his voluntarily undertaking of that risk." This policy argument would penalize an aggrieved buyer for inaction and therefore cannot be valid, particularly when the repudiating seller is in a position to fix his damages on the contract by entering into hedge transactions on the date of his repudiation. As one well-respected commentary explains:

> When the seller of goods has promised delivery at a future time and prior thereto repudiates his contract, the buyer is not required to go into the market at once and make another contract for future delivery merely because there is reason to expect a rise in the market price. If his forecast is incorrect and the price falls, his second contract on a high market increases the loss. If his forecast is correct and the price rises, his second contract avoids a loss and operates as a saving to the repudiator. But the risk of this rise or fall is exactly the risk that the repudiating seller contracted to carry. If at the time of repudiation he thinks that the price will rise, so that his performance will become more costly, he can make his own second contract transferring the risk to a third party and thus hedge against his first risky contract.

11 Arthur Linton Corbin, Corbin on Contracts § 1053, at 273 (Interim ed. 2002). Thus, if Lightning wished to avoid the risk that it undertook in entering into the contract and fix its damages on the date of repudiation, it could have done so by entering into hedge transactions

11

in the futures market. But its repudiation of the contract cannot shift to Hess the very market risk that Hess had sought to avoid by entering into contracts for the future delivery of gas in the first place.

At bottom, we conclude that the district court complied with Virginia Code § 8.2-713 when it instructed the jury in this case that it could calculate damages using the market price on the date of performance, in this case the date of delivery of the natural gas.

III

The remaining issues that Lightning raises do not merit extensive discussion. First, Lightning argues that the NYMEX price upon which damages were calculated does not supply the "price for goods . . . in the same branch of trade," the legal standard that the parties agree is required by Virginia Code § 8.2-713. *See* Va. Code § 8.2-713 official cmt. 2. Lightning's argument, however, fails to account for the fact that its own witnesses testified that they used the NYMEX price as a reference and that they would not enter into any contract on any given day to sell natural gas below the applicable NYMEX price. The testimony from all of the witnesses, including the expert witness, was that the NYMEX price represents the applicable price for natural gas that Hess would expect to pay in purchasing undelivered natural gas on the scheduled date of delivery. Lightning has already had the opportunity to present evidence that the NYMEX price was not the proper market price, and it used this opportunity to tender only witnesses who undermined this position. Thus, the jury's apparent finding that the NYMEX price supplies the proper market price was fully supported by the evidence.

Lightning's final arguments — that the jury award improperly included consequential damages (which are prohibited in the Master Agreement) in the form of lost profits and that Hess failed to mitigate these consequential damages — are premised upon a mischaracterization of the damages awarded in this case. Section 8.2-713 makes the distinction between direct damages and consequential damages. It states that an aggrieved buyer's damages for repudiation by the seller are the market-contract differential "*together with* any incidental and consequential damages." Va. Code § 8.2-713 (emphasis added). This language reflects that a buyer's damages from having to purchase

12

goods in the market upon the seller's refusal to deliver are plainly *direct* rather than *consequential* damages. *See Pulte Home Corp. v. Parex, Inc.*, 579 S.E.2d 188, 193 (Va. 2003) (noting that direct damages "flow directly and immediately" from the act of the breaching party, whereas consequential damages are present where "a detour is required to get from [defendant's] breach . . . to [plaintiff's] damages"). Because consequential damages are prohibited by the Master Agreement, Hess properly limited its evidence to proving its direct damages — the difference between the price it contractually agreed to pay Lightning for the natural gas and the market price of the undelivered natural gas on the date of delivery, and the jury apparently adopted Dr. Carpenter's calculation of this amount.

For this reason, Lightning's additional arguments challenging the jury verdict and certain of the district court's evidentiary rulings based on Lightning's misconstruction of the distinction between direct and consequential damages are likewise without merit, and therefore we reject them also.

Accordingly, we affirm the judgment of the district court.

*AFFIRMED*

13